919 F.2d 1160
 54 Fair Empl.Prac.Cas. 743,
55 Empl. Prac. Dec. P 40,400,
6 Indiv.Empl.Rts.Cas. 186
Harvey WILMER, Plaintiff-Appellant,
v.
TENNESSEE EASTMAN COMPANY, a DIVISION OF EASTMAN KODAK,
Defendant-Appellee.
 No. 89-6172.
 United States Court of Appeals,
Sixth Circuit.
 Argued June 5, 1990.
Decided Nov. 28, 1990.
 
 Charlton R. DeVault, Jr., Kingsport, Tenn., for plaintiff-appellant.
 George O. Burpeau, III, Tennessee Eastman Co., Legal Dept., Kingsport, Tenn., Homer L. Deakins, Jr., Margaret H. Campbell, Devin M. Ehrlich, Ogletree, Deakins, Nash, Smoak & Stewart, Atlanta, Ga., for defendant-appellee.
 Before JONES and RYAN, Circuit Judges, and BROWN, Senior Circuit Judge.
 BAILEY BROWN, Senior Circuit Judge.
 
 
 1
 Harvey Wilmer, a black employee of Tennessee Eastman Company ("Eastman"), appeals the grant of summary judgment in favor of Eastman on Wilmer's claim of racial discrimination in his discharge brought under 42 U.S.C. Sec. 1981[1] and under a state law theory of breach of employment contract. We agree with the result in the district court that Wilmer's Sec. 1981 claim is barred by the recent Supreme Court decision in Patterson v. McLean Credit Union, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989).[2] Moreover, we also affirm the grant of summary judgment in favor of Eastman on the breach of contract claim.
 
 I.
 
 2
 Wilmer was fired by Eastman for what Eastman termed unsatisfactory job performance. Wilmer claimed that the firing was the culmination of racially discriminatory treatment toward him by certain Eastman supervisors. He sued Eastman pursuant to Sec. 1981, both for racially discriminatory treatment during his term of employment and for the firing. The district court dismissed the Sec. 1981 claim of discriminatory treatment on the job, holding that it was barred by the statute of limitations.[3]
 
 
 3
 While the Sec. 1981 discharge claim was pending, the Supreme Court granted certiorari in Patterson v. McLean Credit Union, 805 F.2d 1143 (4th Cir.1986), cert. granted, 484 U.S. 814, 108 S.Ct. 65, 98 L.Ed.2d 29 (1987), in order to revisit the question whether Sec. 1981 authorizes suits against private parties. Wilmer and Eastman made a joint motion for postponement of Wilmer's case in light of the fact that a holding in favor of the employer in Patterson would dispose of Wilmer's Sec. 1981 claim. The court granted the joint motion.
 
 
 4
 The Supreme Court decided in Patterson that Sec. 1981 does authorize suits against private actors, but not in all cases of employment discrimination. Patterson, 109 S.Ct. at 2373.
 
 
 5
 Wilmer then moved to amend his complaint to add a state law claim of breach of the employment contract between Eastman and himself. Eastman responded with a motion for summary judgment, contending that Patterson barred Wilmer's Sec. 1981 claim and that, as a matter of law, the employee handbook and posted company policy statements on which Wilmer was relying for his tendered contract claim did not create any contractual guaranties.
 
 
 6
 The district court granted Eastman's motion on the Sec. 1981 claim. As to the contract claim, the court granted Wilmer's motion to amend the complaint. However, the court warned Wilmer that Eastman's position on this claim was very persuasive. It advised Wilmer that he had to set forth specific evidence to show a genuine issue of material fact concerning whether the statements in the handbook afforded Wilmer a guaranty and, if so, whether an express disclaimer that appeared in the handbook applied to such guaranty.
 
 
 7
 Wilmer responded with his affidavit.[4] He referred to "pages 3 and 4 of the manual," conversations with Eastman supervisors, and the company's posting equal employment policy statements on company bulletin boards as the evidence that created a genuine issue of material fact concerning whether there was a contractual guaranty.
 
 
 8
 The district court granted Eastman's motion for summary judgment. It held that Wilmer had not produced sufficient evidence to show that, under Tennessee law, there was a genuine issue as to whether a contract guaranty existed. Wilmer then appealed both the Sec. 1981 claim and the contract claim to this court.
 
 II.
 
 9
 We begin our analysis by stating the rule that this court is to review a grant of summary judgment de novo. Storer Communications, Inc. v. National Ass'n of Broadcast Employees & Technicians, 854 F.2d 144, 146 (6th Cir.1988). Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).
 
 
 10
 Wilmer challenges the district court's holding that Patterson bars his Sec. 1981 claim. He does not, as heretofore stated, contend that Patterson, if applicable, would not bar a claim by an employee under Sec. 1981 for an allegedly discriminatory discharge. He argues, instead, that Patterson should not apply retroactively to his case.[5] We disagree.
 
 
 11
 The general rule is that a federal court is to apply the rule of law that is in effect at the time the court renders its decision. Goodman v. Lukens Steel Co., 482 U.S. 656, 662, 107 S.Ct. 2617, 2621-22, 96 L.Ed.2d 572 (1987); Lund v. Shearson/Lehman/American Express, Inc., 852 F.2d 182, 183 (6th Cir.1988). This court followed this rule as to the Patterson holding in Risinger v. Ohio Bureau of Workers' Compensation, 883 F.2d 475, 479 (6th Cir.1989), when it held that Patterson barred a Sec. 1981 claim of racially hostile work environment, the facts of which occurred prior to the Patterson holding.
 
 
 12
 Wilmer does not address the Risinger case. Instead, he rests his challenge to the retroactive application of Patterson specifically on Chevron Oil v. Huson, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971), which created a narrow exception to the rule of Goodman v. Lukens Steel Co., supra. If a party meets certain criteria as stated in Chevron Oil, the newly announced rule at issue in a case will not be applied retroactively to it. Chevron, 404 U.S. at 106-07, 92 S.Ct. at 355-56. However, although we recognize that this court in Risinger did not expressly apply a Chevron Oil analysis, it clearly applied Patterson retroactively. Accordingly, we follow Risinger here, as it is the law of the Sixth Circuit. See also Prather v. Dayton Power & Light Co., 918 F.2d 1255 (6th Cir.1990), which expressly applies Patterson retroactively and applies it in a discharge case.[6]
 
 
 13
 Because we hold that Patterson should be applied to Wilmer's case, we affirm the district court's grant of summary judgment in favor of Eastman on the Sec. 1981 claim.
 
 III.
 
 14
 Wilmer also challenges the grant of summary judgment in favor of Eastman on his breach of contract claim. We apply Tennessee law to decide this issue.
 
 
 15
 Tennessee follows the employment-at-will doctrine. This means that employment may be terminated by the employer or the employee at any time without cause. Graves v. Anchor Wire Corp. of Tenn., 692 S.W.2d 420 (Tenn.Ct.App.1985). Even an express contract between an employer and an employee that does not state a definite time period is a contract for employment-at-will. Id. at 422.
 
 
 16
 Wilmer does not argue that he had a contract for a definite period of time such that he could not be fired without cause. Instead, he asserts that there is a genuine issue of material fact as to whether Eastman guaranteed by contract that he would not be fired because of his race. He contends that the employee manual that he was given upon being hired, the manual together with policy statements that were posted on the company bulletin board, or the posted policy statements alone are sufficient to survive summary judgment on the question of whether the alleged contract guaranty existed.
 
 
 17
 In Tennessee, an employee handbook or manual does not create a guaranteed contract right unless the language in the handbook manifests contractual intent on the employer's part or states that the policy included therein is guaranteed. Smith v. Morris, 778 S.W.2d 857, 858 (Tenn.Ct.App.1989); cf. Hamby v. Genesco, Inc., 627 S.W.2d 373, 375-76 (Tenn.Ct.App.1981).
 
 
 18
 In the instant case, the relevant portions of the manual provided:
 
 
 19
 [The Policy Statement, on page 4]
 
 
 20
 Equal Employment Opportunity: It is Eastman's policy to provide equal opportunity for all qualified persons; to prohibit unlawful discrimination in employment practices, compensation practices, personnel procedures, and the administration of benefit plans and other programs; and to promote a full realization of equal employment opportunity through continuing affirmative action throughout the Company establishments.
 
 
 21
 [The Disclaimer, on page 6 within the same section of the manual as the Policy Statement]
 
 
 22
 All statements contained in this section are intended to reflect general policies, principles, and procedures, do not represent a contractual commitment on the part of the Company, and may be changed at any time without notice.
 
 
 23
 These statements clearly are not adequate under Tennessee law to create any contractual guaranty. In fact, the disclaimer expressly states that there is a lack of contractual intent on the part of the employer as to, inter alia, the equal opportunity statement.
 
 
 24
 Moreover, the disclaimer apparently prevents the employee manual, absent some other guaranteed provisions therein, none of which Wilmer offered either to this court or to the district court, from constituting part of any contract between Wilmer and Eastman. Therefore, there is no basis for Wilmer's suggestion that the manual and posted policy statements together created a contract.
 
 
 25
 Wilmer argues in the alternative that the posted policy statements, standing alone, created a contractual guaranty. The statements on which Wilmer relies provided in pertinent part:
 
 
 26
 In adherence to this policy, we will not discriminate against any employee or applicant for employment because of race, color,....
 
 
 27
 This policy applies to all matters pertaining to employment, such as recruiting, hiring, training, on-the-job treatment, and promotion;....
 
 
 28
 I [the company president] personally endorse this policy and support continued progress and further achievements and in doing so commit all of us who can in any way contribute.
 
 
 29
 Beside the fact that these statements make no mention of discharges, they, standing alone, as the district court determined, fail to manifest any contractual intent, and they include no guaranties. Therefore, they fail to create a genuine issue of material fact as to whether Eastman had guaranteed by contract not to fire Wilmer on account of his race.
 
 IV.
 
 30
 The dissent argues that Patterson does not apply to a claim under Sec. 1981 for a discriminatory discharge. However, as we have made clear, supra, Wilmer does not contend, on appeal, that Patterson, if given retroactive effect, does not apply to this Sec. 1981 claim. Further, in Prather, supra, this court has applied Patterson in a discharge case. Moreover, and in any event, since we herein hold that, under Tennessee law, Wilmer was an employee at will and had no contract of employment, Wilmer could not in this action recover for a discriminatory discharge in breach of contract.
 
 V.
 
 31
 Because we determine that the district court's decision holding that Wilmer has no claim for relief under Sec. 1981 must be affirmed, and because we find no genuine issue of material fact as to whether the employee manual or the posted policy statements created any contractual guaranties, we AFFIRM the grant of summary judgment in favor of Eastman.
 
 
 32
 NATHANIEL R. JONES, Circuit Judge, dissenting.
 
 
 33
 I view it as of overriding national importance that overt and subtle vestiges of America's racial past be rooted out of the workplace. The majority's application of the Supreme Court's cramped interpretation of section 1981 in Patterson v. McLean Credit Union, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), to the clearly distinguishable facts of this case needlessly frustrates the attainment of this crucial national imperative. Such a result is not compelled by Patterson. Therefore, I respectfully dissent.
 
 
 34
 I write in dissent to respectfully remind my colleagues that in interpreting section 1981[1] we must be mindful that, as judges, we are not acting in a vacuum. There is a history here. A sordid, shameful history. Thus, in interpreting a Reconstruction civil rights remedial statute we should do so in a way that gives effect to legislative intent and to the nation's policy of eradicating discrimination in employment.[2]
 
 
 35
 The gravamen of Wilmer's complaint is a section 1981 claim for discriminatory discharge. The majority disposes of this claim by concluding that section 1981 does not apply to an employment contract terminated for racially discriminatory reasons. My reading of Patterson, however, would not foreclose suits for racial discrimination in the termination of employment contracts. In addition, as I discuss in Part II, the majority's interpretation of Patterson is contradicted by the express terms of the (recently-vetoed) Civil Rights Act of 1990.
 
 
 36
 * Patterson held that section 1981 does not apply to a claim of racial harassment in employment. As Patterson did not explicitly address the applicability of section 1981 to a discriminatory discharge claim, the lower courts have been left to fashion their own approaches. Gonzalez v. Home Insurance Co., 909 F.2d 716, 722 (2d Cir.1990) ("In the wake of Patterson, courts have divided as to whether a viable claim for discriminatory termination of a contract may still be brought under Sec. 1981.").
 
 
 37
 I do not interpret Patterson to bar suits which involve claims of racially discriminatory discharge. The argument that Patterson, which dealt with a racial harassment claim, should limit discriminatory firing claims appears to me to shortchange the significance of section 1981.[3] Our majority opinion places this circuit in the line of march with those who are, needlessly, in my judgment, in retreat on civil rights enforcement. We have a choice here. I would follow the Eighth Circuit's decision in Hicks v. Brown Group, Inc., 902 F.2d 630 (8th Cir.1990), reh'g denied en banc, 902 F.2d 630 (1990). In a remarkably thorough and compelling opinion, including an extensive discussion of section 1981's legislative history, the Eighth Circuit in Hicks held that discriminatory discharge impinges on the right to make contracts, and therefore comes under the protection of section 1981. Id. at 639. The court focused on the incongruity of prohibiting an employer from hiring on the basis of race, but allowing the same employer to fire employees on the basis of race: "Such an absurd interpretation would allow discriminatory discharge to effectively annihilate the right to make contracts." Id.
 
 
 38
 The reasoning in Hicks has also been adopted by the U.S. District Court for the Northern District of Georgia.[4] Kriegel v. Home Ins. Co., 739 F.Supp. 1538 (N.D.Ga.1990). In reconciling Patterson with the meaning of section 1981, the court in Kriegel concluded that "[c]laims based on racially discriminatory hiring and firing always have been considered actionable under the right to make contracts and have been analytically distinct from racial harassment claims." Id. at 1540. But see McKnight v. General Motors, 908 F.2d 104, 112 (7th Cir.1990) (discriminatory termination does not infringe right to make a contract and therefore is not actionable under section 1981). Given my conclusion that Patterson does not bar a discriminatory discharge claim, I dissent from that aspect of the majority's holding.
 
 II
 
 39
 Several Courts of Appeals have interpreted Patterson to bar racially discriminatory termination claims.[5] In response, Congress overwhelmingly passed legislation designed to insure that section 1981 continues to apply to all aspects of the employment relationship. The Civil Rights Act of 1990 ("the Act"), S. 2104, 101st Cong., 2d Sess., 136 Cong.Rec. 9944-46 (1990), was designed to redress the Supreme Court's emasculation of employment discrimination law during the 1988 term. See Gould, The Supreme Court and Employment Discrimination Law in 1989: Judicial Retreat and Congressional Response, 64 Tul.L.Rev. 1485 (1990).
 
 
 40
 Section 2(b) stated that the purpose of the Act was to "respond to the Supreme Court's recent decisions by restoring the civil rights protections that were dramatically limited by those decisions." 136 Cong.Rec. at 9944. Section 12(b) specifically overturned restrictive interpretations of Patterson by providing that "the right 'to make and enforce contracts' shall include the making, performance, modification and termination of contracts [.]" Id. at 9945 (emphasis added).
 
 
 41
 Under section 15, the Act would have applied to our disposition of the instant case.[6] Section 15(a)(6) stated that "section 12 shall apply to all proceedings pending on or commenced after June 15, 1989 [the date Patterson was handed down]." Furthermore, section 15(b)(1) provided that any disposition of a case between the date Patterson was announced and the date of the passage of the Act which is inconsistent with section 12 "shall be vacated if, not later than 1 year after such date of enactment, a request for such relief is made." Thus, Wilmer could have resubmitted his claim if the Act had become law, and we would have been required to reverse our disposition of his section 1981 claim.
 
 III
 
 42
 Vetoed legislation should not ordinarily serve as guidance for lower courts. In certain instances, however, Congressional intent has served as a valid basis for judicial interpretation in spite of a Presidential veto. In 1984, for example, a re-enactment of the Equal Access to Justice Act (EAJA) was passed by large majorities in both houses of Congress. Although the EAJA was not reenacted due to President Reagan's veto, the Third Circuit and the Fifth Circuit both found certain portions of the vetoed bill's legislative history to be a convincing indicator of Congressional intent. In Taylor v. United States, 749 F.2d 171, 174 (3d Cir.1984), the court stated that:
 
 
 43
 Although the President declined to sign the bill into law, we nonetheless find its language and legislative history to be instructive on the question of the meaning of "final judgment" under the original EAJA.
 
 
 44
 * * * * * *The President's pocket veto renders the bill to reenact the EAJA without legal effect, but we find the language of the bill and its legislative history persuasive as a clear expression of congressional intent.
 
 
 45
 Similarly, in Clifton v. Heckler, 755 F.2d 1138, 1145 n. 15 (5th Cir.1985), the court found that "Regardless of the President's veto of the bill ... we find its legislative history instructive on the question of the intended nature of the thirty-day limitation under the original EAJA."
 
 
 46
 Thus, I find an overwhelming consensus--both Congress and the President favor reversing Patterson --in favor of applying section 1981 to discriminatory discharge.[7] The Civil Rights Act of 1990 was a repudiation by Congress of the Supreme Court's narrow interpretation of federal civil rights statutes. Moreover, the Act represented the seventh occasion since 1975 that Congress has felt compelled to address the Supreme Court's increasingly cramped interpretations of federal civil rights laws. Ralston, Court v. Congress: Judicial Interpretation of The Civil Rights Acts and Congressional Response, 8 Yale L. & Pol'y Rev. 205, 210 (1990) ("[B]etween 1976 and 1988, Congress overruled restrictive readings of civil rights statutes six separate times, an average of one statute per Congress."). See also Wards Cove Packing Co. v. Atonio, 490 U.S. 642, 109 S.Ct. 2115, 2132, 104 L.Ed.2d 733 (1989) (Stevens, J., dissenting) ("Congress frequently revisits [Title VII] and can readily correct our mistakes if we misread its meaning."). The Act is also certain to be reintroduced in the immediate future. Thus, the fact that the Senate, on October 24, 1990, failed by one vote to override the Presidential veto of the Act need not diminish its significance.
 
 
 47
 The veto of the Civil Rights Act of 1990 capped a decade-long effort on the part of the executive branch to frustrate the efforts of the legislative branch to provide remedies for employment and housing discrimination against racial minorities and women. Throughout the mid-1980s, the Civil Rights Division of the Justice Department filed numerous briefs urging the Court to narrow its interpretation of Title VII. However, the limitations placed on plaintiffs by the Court in 1989 must have surprised even the most ardent opponents of civil rights enforcement.
 
 
 48
 Congress' constitutional authority to respond to judicial limitations of civil rights laws, spelled out in section 5 of the fourteenth amendment, should have prompted the administration to debate the merits of the Act with greater seriousness, especially in view of the overwhelming sentiment in favor of the Act. The identification of "quotas" as the reason for the veto is puzzling given that many Senators who were initially intense opponents of the bill recommended passage following negotiations over the "quota" issue (these negotiations resulted in some thirty modifications of the bill). The Act was also strongly supported by many organizations--such as the American Jewish Congress and the Anti-Defamation League--which have maintained longstanding opposition to quotas. With one stroke of the pen, the administration has left in place restrictions of individual civil rights at a time when we have witnessed a drive toward the expansion of individual rights in many long-oppressed corners of the globe.
 
 
 49
 The myopia which resulted in the veto of the Act is startling, and masks an assumption that "[a]ll things [are] equal, with no history of discrimination.... But all things are not equal in a system that has been deliberately constructed and maintained to enforce racial segregation." Swann v. Charlotte-Mecklenberg Bd. of Educ., 402 U.S. 1, 28, 91 S.Ct. 1267, 1282, 28 L.Ed.2d 554 (1971) (unanimous opinion of Burger, C.J.). See also Wards Cove, 109 S.Ct. at 2136 (Blackmun, J., dissenting) ("One wonders whether the majority still believes that race discrimination--or, more accurately, race discrimination against non-whites--is a problem in our society, or even remembers that it ever was.").
 
 
 50
 The portion of the Act which overturned Patterson was probably its least controversial section. My perusal of the vociferous Congressional debates over the Act reveals little, if any, opposition to the Act's application of section 1981 to all aspects of the employment relationship. The Justice Department itself has drafted legislation designed to overturn Patterson. Ralston, supra, at 216-17. The inherent inequities in Patterson were expressed by Charles Fried, Solicitor General during the Reagan Administration, in his testimony regarding the Civil Rights Act of 1990:
 
 
 51
 The bill does a very good thing here: it extends the protection of the Reconstruction Civil Rights Act, what is now section 1981, to some very ugly and demeaning forms of discrimination which the Supreme Court in the Patterson case last Term held were not covered by that statute. By the amendment that is proposed in this bill, acts of discrimination after a person has been hired are as actionable as racially motivated refusals to enter into the employment relation in the first place.... [F]rom a human point of view it is worse for a person to be subject to demeaning treatment in a job they have come to rely on than to be foreclosed from getting into the situation in the first place.
 
 
 52
 136 Cong.Rec. S9894 (daily ed. July 18, 1990).
 
 
 53
 Nevertheless, cases alleging racially discriminatory termination under section 1981 will continue to be summarily dismissed under Patterson if the precedent established here is followed. Countless numbers of potential claims of discrimination will go unredressed. I regret that our disposition of this case further minimizes the scope and effectiveness of section 1981.
 
 IV
 
 54
 For the foregoing reasons, I respectfully DISSENT.
 
 
 
 [1]
 Section 1981 provides:
 All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.
 42 U.S.C. Sec. 1981 (1981).
 
 
 [2]
 As will be seen infra, Wilmer does not contend on appeal that Patterson, if applicable, does not bar his Sec. 1981 claim. He contends only that Patterson should not be applied to a discharge claim where the discharge occurred before that decision
 
 
 [3]
 Wilmer does not appeal this decision
 Wilmer originally also brought a claim pursuant to Tenn.Code Ann. Sec. 4-21-301, the Tennessee Human Rights Act, which the district court dismissed because Wilmer had failed to appeal an agency determination that was adverse to him. This holding also is not a subject of appeal.
 
 
 [4]
 Wilmer claims in his brief that he responded with two personal affidavits, one dated August 4, 1989, and one dated August 8, 1989. Only the latter affidavit was provided to this court in the Joint Appendix
 
 
 [5]
 Wilmer takes this position although he had agreed with Eastman to postpone consideration of his case by the district court pending the decision by the Supreme Court on the ground that Patterson might be dispositive. He, nevertheless, now asserts that Patterson should not be given retroactive effect
 
 
 [6]
 In addition to the published Risinger opinion, this court has applied Patterson retroactively in at least four unpublished opinions. See Jones v. City of Cleveland, 898 F.2d 154 (6th Cir.1990) (discharge claim); Bell v. Krogers, Inc., 897 F.2d 529 (6th Cir.1990) (transfer claim); Singleton v. Kellogg Co., 890 F.2d 417 (6th Cir.1989) (discharge claim); Becton v. Burlington N. R.R., 878 F.2d 1436 (6th Cir.1989) (claims of harassment and demotion). Since these are unpublished opinions, we do not rely on them as authority
 
 
 [1]
 42 U.S.C. Sec. 1981 reads as follows:
 All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.
 
 
 [2]
 In its thorough review of the legislative history and historical context surrounding the adoption of section 1981 in 1866, the Eighth Circuit concluded that "[g]iven Congress' acquaintance with and concern about the varied forms of southern intransigence, we doubt that it would have subscribed to an interpretation of Section 1981 that secures the equal right of the freedmen to make contracts at the formation stage, but then abandons them after the contract is formed." Hicks v. Brown Group, 902 F.2d 630, 648 (8th Cir.1990), reh'g denied en banc, 902 F.2d 630 (1990)
 This country's strong public policy against discrimination was forcefully expressed by Chief Justice Burger in Bob Jones Univ. v. United States, 461 U.S. 574, 592-93, 103 S.Ct. 2017, 2028-29, 76 L.Ed.2d 157 (1983):
 [T]here can no longer be any doubt that racial discrimination ... violates deeply and widely accepted views of elementary justice.... Over the past quarter of a century, every pronouncement of this Court and myriad Acts of Congress and Executive Orders attest a firm national policy to prohibit racial segregation and discrimination[.]
 
 
 [3]
 William T. Coleman, Jr., who served as Secretary of Transportation during the Ford Administration, testified before Congress that "Patterson has virtually eviscerated the 1866 Civil Rights Act." The Civil Rights Act of 1990: Joint Hearings Before the Committee on Education and Labor and the Subcommittee on Civil and Constitutional Rights of the Committee on the Judiciary, 101st Cong., 2d Sess. 440 (1990) (hereinafter Joint Hearings )
 
 
 [4]
 An alternate view of Patterson has also developed. In Gonzalez v. Home Insurance Co., 909 F.2d 716 (2d Cir.1990), the Second Circuit attempted to interpret Patterson to allow for some racially discriminatory discharge claims, while at the same time adhering to its view that, under Patterson, section 1981 does not generally apply to contract termination. Gonzalez, then, states that Patterson does not bar discriminatory discharge suits if the plaintiff, in good faith, alleges that the employer intended at the time of the formation of the contract to terminate him or her for racially discriminatory reasons. Id. at 722 (allowing plaintiffs to amend complaint in order to charge that defendants "harbor[ed] the intent to terminate the agreement because of plaintiff's race.")
 
 
 [5]
 The NAACP Legal Defense and Educational Fund estimates that Patterson has resulted in the dismissal of well over 150 claims. 136 Cong.Rec. S9958 (daily ed. July 18, 1990) (statement of Senator Riegle)
 
 
 [6]
 The version of the Act passed by the House and ultimately submitted to the President contained a provision seemingly designed to alter the retroactivity of the Act. Section 15(b)(3), entitled "Final Judgments", stated that "any final judgment entered prior to the date of the enactment of this Act as to which the rights of any of the parties thereto have become fixed and vested, where the time for seeking further judicial review of such judgment has otherwise expired ... shall be vacated in whole or in part if justice requires pursuant to rule 60(b) ... or other appropriate authority, and consistent with the constitutional requirements of due process of law."
 This provision, in my view, does not affect the retroactivity of the Act, which remains clearly stated in section 15(b)(1). Any limitation on the Act's retroactivity would stem from the requirement that judgments be vacated "if justice requires pursuant to Rule 60(b)(6)." Rule 60(b) defines the parameters under which relief from a final judgment may be obtained. Rule 60(b)(6) is a catch-all provision providing that relief from a final judgment may be obtained for "any other reason justifying relief from the operation of the judgment." Section 15(b)(3), then, appears to me to provide a firmer statutory basis for overturning judgments rendered under Patterson. Although section 15(b)(3) does appear to restrict retroactivity to those situations "consistent with the constitutional requirements of due process of law", I do not read this due process requirement to impact substantially on the retroactivity provisions explicitly stated in section 15(b)(1).
 
 
 [7]
 Urging the adoption of the 1990 Civil Rights Act--which overturns Patterson --does not conflict with my earlier position interpreting Patterson not to prohibit suits for discriminatory discharge under section 1981. In my view, the Act simply seeks to clarify the intent of the 1866 Congress in passing section 1981. The Supreme Court's strained interpretation of section 1981 in Patterson forced the Congress to clearly articulate by statute that section 1981 was always intended to apply to every phase of the employment relationship. Furthermore, I would argue that the actual holding of Patterson is inconsistent with the Congressional intent behind section 1981. As former Secretary of Transportation Coleman testified before the Senate Committee on Labor and Human Resources:
 As a matter of statutory construction the results in some of these decisions are, to put the matter delicately, far fetched, and in some instances, actually absurd. For example, in Patterson can it seriously be imagined that in 1866 Congress intended to forbid a private employer from refusing to hire or promote a black because of race, but felt at the same time there would be nothing wrong if the employer hired a black woman and then visited her with harassment which certainly would make the contract a nullity or at least make her life a living hell? But that is the result of the Court's ruling in Patterson.
 Joint Hearings, supra note 3, at 437-38.