**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 05a0909n.06
Filed: November 18, 2005

**No. 04-4274**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| MICHAEL AQUINO, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | On Appeal from the United States |
| | ) | District Court for the Southern |
| HONDA OF AMERICA, INC.; YOLANDA TERRY; | ) | District of Ohio |
| SCOTT SUPPLEE; ROBERT ROTH; and KEVIN A. | ) | |
| WELLER, | ) | |
| | ) | |
| Defendants-Appellees. | | |

Before: **BOGGS, Chief Judge; and NORRIS and COOK, Circuit Judges.**

**PER CURIAM.** Plaintiff-Appellant Michael Aquino appeals from the district court's grant of defendants' motion for summary judgment. Aquino filed suit against Honda of America Manufacturing, Inc. ("Honda") and several Honda employees, alleging claims arising under 42 U.S.C. § 1981, and the Fourth and Fourteenth Amendments to the United States Constitution, and pendent state law claims. Aquino also alleged claims against Deputy Sheriff Kevin Weller of Ohio's Union County Sheriff's Department arising under 42 U.S.C. § 1983, and the Fourth and Fourteenth Amendments to the United States Constitution. The case stems from the circumstances of Aquino's detention at Honda's Marysville plant upon suspicion of vandalizing automobiles on the assembly line, the officer's subsequent search of Aquino's person, and the resulting termination of Aquino's

-1-

No. 04-4274

Aquino v. Honda of America Mfg.

employment at Honda. Following discovery, all of the defendants moved for summary judgment on the federal claims. The district court granted these motions, dismissing each of the federal claims with prejudice, and then dismissing the state claims without prejudice. We affirm.

**I**

Michael Aquino, of Chinese-Filipino descent, had worked at Honda's Marysville plant since July 1994 as an at-will employee. In 2001, Aquino worked in the "M" area, the engine sub-assembly area, where he and his co-workers were responsible for preparing automobile engines for installation into vehicles. In May 2001, Honda suspended him. After he returned from his suspension, Honda moved him "down the line" to the "N-4" area where the engine is installed in the car. There were 39 employees in "N-4," of whom Aquino was the only non-white employee.

Beginning in September 2001, Honda discovered a number of incidents of vehicle tampering and vandalism. In early October, Robert Roth, an assistant plant manager, concluded after investigation that Aquino was the only employee who enjoyed access to the tools necessary for the vandalism when the affected vehicles came through his area. On October 19, other Honda employees reported that five units were missing front engine mount bracket bolts, and several supervisors subsequently spotted the missing bolts within twenty feet of Aquino's work station on "N-4." On October 23, five vehicles were found to be missing their instrument panel caps in suspicious circumstances and, near the end of the line, four other completed vehicles were found to be leaking fluid and whose hoses appeared to have been intentionally sliced. Roth, already suspecting vandalism stemming from the "N" area, asked the relevant team leader about employee

Aquino v. Honda of America Mfg.

access to knives in that area. Roth was informed that Aquino had been the only employee who had performed an official process involving a box cutter or knife during the period when the affected vehicles had come through the his area. The team leader of the "N-4" area brought the box cutter to Roth at his request. It is not clear where or how the team leader found it. Roth and others agreed that Aquino should be questioned.

Roth and two other Honda supervisors, Evan Benjamin, and Yolanda Terry, brought Aquino to a conference room at the plant where they interrogated him for about 45 minutes. Aquino denied any knowledge of the incidents. One of the defendants asked for his identification badge. Aquino replied that his badge was in his lunchbox, down by the assembly line. The Honda associates left the room, leaving Aquino alone for approximately 40 minutes. Roth retrieved the lunchbox and, peering inside, saw the caps that had gone missing earlier that day, bearing scratch marks that made it appear to Roth as if they had been pried out of the dashboard after installation. Roth reported his findings to other Honda managers, and they in turn notified Scott Supplee, a Honda manager in charge of plant services and security.

Terry, Benjamin, and Supplee entered the conference room with Aquino's lunchbox. Aquino took his lunchbox, placed it on the floor beside his chair, reached into it, and handed them his badge. Supplee asked Aquino to place his lunchbox on the table. Aquino complied and then reached into the box to retrieve two pairs of gloves. Now that the Honda employees in the room could see the panel caps in the lunch pail, Supplee asked Aquino about them. Aquino denied having any knowledge as to how they came to be in his lunch pail. Supplee and the others also spotted three

small knives in the lunchbox. Another interrogation ensued, during which Supplee asked Aquino to "come clean about the parts in there." Aquino denied any responsibility. After about 40 minutes, all of the Honda managers left the room, leaving Aquino alone once again. Aquino did not ask whether he could leave the room. Aquino states that the Honda defendants warned him to stay in the room until the police arrived.

Supplee called the local police. Deputy Weller of Ohio's Union County Sheriff's Department was dispatched and, upon arriving at the plant, spoke with Supplee and Terry. Supplee advised Weller that Honda had recently experienced vandalism and theft of parts, and that someone had slashed four rubber hoses earlier that day. Supplee then told the officer that Honda had undertaken an internal investigation and had determined that Aquino was the most likely culprit. Supplee also said that Honda had already interrogated Aquino, and that Honda employees had discovered missing parts, a box cutter, and several pocket knives in Aquino's possession.

Weller entered the conference room and provided the *Miranda* warnings to Aquino but did not arrest him. The officer later claimed that this was his standard practice in all cases to ensure that suspects would know the possible consequences of speaking to him. Aquino agreed to speak to him. Weller informed Aquino of Honda's allegations. Aquino could not explain how Honda's property appeared in his lunchbox. Weller asked if he would be willing to provide a voluntary written statement; after Aquino had agreed to do so, Weller gave him some sheets of paper entitled "Voluntary Statement Form," whereupon Aquino wrote responses to a series of questions and signed

his name.[1]  Aquino claims that the officer told him he had to provide the written statement, but Aquino also admits that he never objected to doing so.

Sometime during the time that Aquino was giving this statement, Supplee re-entered the room to inform Weller that Aquino had not been "frisked."  The officer asked Aquino to empty his pockets.  After Aquino did so, the deputy then asked if he could perform a pat-down search of Aquino's person.  Aquino did not object.  Aquino claims that the officer had told him to "assume the position" whereupon Aquino was placed against the wall and searched.  The officer found various screws in Aquino's right front pocket.  Aquino did not complain after he was frisked and he never asked any questions of the deputy.  Weller never tried to handcuff Aquino, nor did he place him under arrest.  After meeting with Aquino for approximately 30 to 40 minutes, Weller left the room, taking with him the screws and the other items found in Aquino's lunch pail.  There is no allegation that Weller threatened Aquino with arrest or otherwise attempted to coerce information from him, nor that he acted in a threatening or unprofessional manner.  After this interview, Weller left the Honda plant.  He subsequently filed an investigative report and notified his superiors of the incident.  Weller had no further contact with Aquino or the case.

Aquino was then placed on administrative leave in accordance with Honda's policy while Terry conducted her own separate investigation.  Terry concluded that Aquino was the only common

---

[1]Deputy Weller asked Aquino who retrieved or peered into his lunchbox, whether he knew anyone who would want to tamper with his lunchbox, whether Aquino had been in trouble before, and whether he knew how those parts came to be in his lunch pail.  Aquino answered in the negative to all of the officer's questions.

No. 04-4274

Aquino v. Honda of America Mfg.

denominator among the vandalism incidents. Honda terminated Aquino's employment on November 6, 2001. The police department decided later that there was insufficient physical evidence to prosecute Aquino.

Aquino filed this lawsuit on March 19, 2003. On September 16, 2004, the district court granted the defendants' motions for summary judgment as to all federal claims, ruling that Weller was entitled to qualified immunity and that Aquino had failed to establish a § 1981 case against Honda. On October 14, 2004, Aquino filed a timely appeal from the district court's grant of summary judgment as to the § 1983 claim against Weller and the § 1981 claim against Honda and its employees.

## II

The court of appeals reviews an order granting summary judgment *de novo*. *Johnson v. Karnes*, 398 F.3d 868, 873 (6th Cir. 2005). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), it must present significant probative evidence in support of its complaint to defeat the motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). "The mere existence of a scintilla of evidence in support of the

plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.

Section 1983 provides a federal cause of action against any person who, acting under color of state law, deprives another of his federal rights. 42 U.S.C. § 1983. Public officials sued under § 1983 for actions taken in the course of their discretionary activities have qualified immunity from suit. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Under qualified immunity law, police officers and other public officials who perform discretionary functions are entitled in certain circumstances to be shielded from lawsuits and, like an absolute immunity, this immunity is essentially lost if a suit is permitted to proceed to trial. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). As a result, the Supreme Court has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Ibid.* To resolve the question of immunity, a court "must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation." *Conn v. Gabbert*, 526 U.S. 286, 290 (1999). The Sixth Circuit has employed a tripartite test for qualified immunity claims: first, whether a constitutional violation has occurred; second, whether that right is so clearly established that a reasonable person would have known; third, whether the evidence indicates that the official's actions were objectively unreasonable in light of clearly established constitutional rights. *Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999) (en banc). This court has also followed the two-step analysis of *Saucier*. *Comstock v. McCrary*, 273 F.3d 693, 701-02 (6th Cir. 2001); *Fisher v. Harden*, 398 F.3d 837, 842 (6th Cir. 2005) (seizure for

mental health reasons). Because the first element of both tests is substantially identical, and because

we decide this matter based on the first element, we need not address the differences in the two

tests.[2]

With regard to the first element of the qualified immunity test, the constitutional right in

question must have been recognized by the courts. *Sheets v. Moore*, 97 F.3d 164, 166 (6th Cir.

1996). This circuit has noted:

> Under the Fourth Amendment, there are three types of permissible encounters
> between the police and citizens: consensual encounters in which contact is initiated
> by a police officer without any articulable reason whatsoever and the citizen is
> briefly asked some questions; a temporary involuntary detention or *Terry* stop which
> must be predicated upon 'reasonable suspicion;' and arrests which must be based on
> probable cause.

*United States v. Bueno*, 21 F.3d 120, 123 (6th Cir. 1994) (citations omitted).

As with determining consent for the purposes of a motion to suppress, whether consent for

a search was given must "be determined from the totality of all the circumstances." *United States*

*v. Carter*, 378 F.3d 584, 587 (6th Cir. 2004) (en banc), *cert. denied*, 125 S. Ct. 1298 (2005)

(citations and internal quotation marks omitted) (affirming denial of motion to suppress). *See*

*United States v. Arvizu*, 534 U.S. 266, 273 (2002) (determining officer's reasonable suspicion

---

[2]As we noted in *Myers v. Potter*, "Although some courts occasionally employ a third step
to determine whether the state official's actions are objectively unreasonable in light of the
clearly established constitutional rights, in many factual contexts, . . . the fact that a right is
clearly established sufficiently implies that its violation is objectively unreasonable." *Myers v.
Potter*, 422 F.3d 347, 352 (6th Cir. 2005) (citations and internal quotation marks omitted).

subject to a 'totality of circumstances' analysis). Pursuant to a consensual stop, a police officer "may approach an individual and ask general questions without having any reasonable suspicion of criminal activity, so long as the officers refrain from the type of intimidating behavior that would lead a reasonable person to believe that the person was not free to leave." *United States v. Waldon*, 206 F.3d 597, 603 (6th Cir. 2000) (citations omitted). The test is thus objective rather than subjective. "A seizure occurs during a police-citizen encounter only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Taylor*, 956 F.2d 572, 575-76 (6th Cir. 1992) (citations and internal quotation marks omitted). A reasonable person may not feel free to leave if the officer engages in overbearing or coercive activity in making requests or conveys the message that compliance with requests is required. *See Waldon*, 206 F.3d at 603. The threatening presence of several officers, the display of a weapon by an officer, or some physical touching might also indicate to a reasonable person that he or she is not free to leave. *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). This is a necessary but not a sufficient condition to establish a seizure. *California v. Hodari*, 499 U.S. 621, 627-28 (1991). "It is well-settled that a person may waive his *Fourth Amendment* rights by consenting to a search. Consent to a search may be in the form of words, gesture, or conduct. In whatever form, consent has effect only if it is given freely and voluntarily." *United States v. Carter*, 378 F.3d at 587 (citations and internal quotation marks omitted).

In the present case, the district court held that there was no genuine issue as to the fact that Aquino had voluntarily consented to answer questions and to being searched. We agree. Aquino

argues that although he submitted without complaint, the circumstances indicate that his acquiescence was not consensual because (1) he did not feel free to leave, (2) the officer read him his *Miranda* rights, and (3) the officer demanded that Aquino submit to a search and subsequently placed him against the wall for the purposes of that search. Yet the test is objective in nature, so the court must look to the revealed circumstances of the encounter and not simply to the searched party's later testimony as to his consciousness at the time of the encounter. In that regard, the officer never informed Aquino that he could not leave, nor did he arrest or detain Aquino; merely delivering the *Miranda* warnings to a person does not, *ipso facto*, amount to a seizure. Aquino did not object in any discernable way to the officer's questions or to the subsequent search. The officer did not threaten or intimidate Aquino, nor did he take Aquino into custody. *See United States v. Worley*, 193 F.3d 380, 386 (6th Cir. 1999) (suspect's saying "you've got the badge, I guess you can" did not constitute consent where the context was intimidating and suspect testified that he thought he had no choice). Aquino's acquiescence was not tainted by "duress, coercion [or] trickery." *United States v. Jones*, 641 F.2d 425, 429 (6th Cir. 1981) (officers kicked in the door, entered with firearms drawn, and claimed to have a warrant) (citations omitted). Instead, Aquino agreed to deliver a voluntary statement, and he placed himself against the wall in submission to the officer's request to pat him down. *See United States v. Carter*, 378 F.3d at 588-89 (suspect silently consented to officers' entry into his room by moving out of the way to allow them to enter).

Although Aquino later testified in a deposition that he felt compulsion, the evidence demonstrates no genuine issue as to the lack of objective coercion in the encounter. His decision to cooperate "may have been rash and ill-considered, but that does not make it invalid." *Ibid*. For

No. 04-4274

Aquino v. Honda of America Mfg.

these reasons, we hold that Aquino consented to the search. Because the encounter was consensual

in nature, the police officer did not violate the suspect's constitutional rights. Therefore, we affirm

the district court's grant of summary judgment as to Aquino's § 1983 claim.

## III

With regard to Aquino's § 1981 claim, the court reviews orders granting summary judgment

*de novo*. *Johnson v. Karnes*, 398 F.3d at 873. Appellant complains that Honda and several of its

employees terminated his employment in violation of 42 U.S.C. § 1981.[3] In relevant part, § 1981

---

[3]As a threshold matter, Honda asserts that at-will employees, such as the plaintiff in the instant case, do not possess a contract enforceable under § 1981. At first glance, there does seem to be some merit to this assertion. *See* Marjorie A. Shields, *Can 'At-Will' Employee Bring Action for Racial Discrimination Under 42 U.S.C.A. § 1981*, 165 A.L.R. Fed. 143 (2000). Although the Supreme Court held in *Patterson v. McLean Credit Union*, 491 U.S. 164 (1989), that § 1981 does not apply to all racially harassing behavior that occurs after the formation of a contract, the Court later recognized that Congress had overturned this result by altering the statute in 1991. *Jones v. R.R. Donnelley & Sons, Inc.*, 541 U.S. 369, 372-73 (2004). This court affirmed summary judgment in an at-will employment discriminatory discharge suit brought under § 1981 on the narrow ground that the plaintiff had only appealed the trial court's retroactive application of *Patterson*. *Wilmer v. Tennessee Eastman Kodak, Div. of Eastman Kodak*, 919 F.2d 1160, 1161-63 (6th Cir. 1990). This court therefore has not ruled that discriminatory discharge suits by at-will employees cannot be brought under § 1981, and pursuant to *Jones*, it is clear that Congress amended § 1981 to reverse *Patterson* even if it is applied to discharge suits. The Second, Fourth, Fifth, Eighth, and Tenth Circuits have all ruled that § 1981 potentially protects at-will employment. *See Lauture v. Int'l Business Machines Corp.*, 216 F.3d 258 (2d Cir. 2000); *Spriggs v. Diamond Auto Glass*, 165 F.3d 1015 (4th Cir. 1999); *Fadeyi v. Planned Parenthood Ass'n of Lubbock, Inc.*, 160 F.3d 1048 (5th Cir. 1998); *Skinner v. Maritz, Inc.*, 253 F.3d 337 (8th Cir. 2001). No circuits have ruled differently. Therefore, the question of the potential applicability of § 1981 to at-will employment disputes rests on the employment contract. Whether employment is at-will and whether an at-will employment relationship constitutes a contract are matters of state law. At least two trial courts within this circuit have held that § 1981 applies to at-will employment in Tennessee and Ohio. *Henry v. Trammell Crow SE*, 34 F. Supp. 2d 629, 634 (W.D. Tenn. 1998); *Williams v. United Dairy Farmers*, 20 F. Supp. 2d 1195, 1202 (S.D. Ohio 1998). For these reasons, we agree that § 1981 does, in fact, apply to at-will employment relationships in Ohio.

-11-

states "[a]ll persons . . . shall have the same right . . . to make and enforce contracts, to sue, be

parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security

of persons and property as is enjoyed by white citizens." This court has noted "[t]he elements of

[a] *prima facie* case as well as the allocations of the burden of proof are the same for employment

claims stemming from Title VII and § 1981." *Noble v. Brinker Int'l, Inc.*, 391 F.3d 715, 720 (6th

Cir. 2004) (citations and internal quotation marks omitted). "A plaintiff may establish a claim of

discrimination either by introducing direct evidence of discrimination, or by proving circumstantial

evidence which would support an inference of discrimination." *Johnson v. Univ. of Cincinnati*, 215

F.3d 561, 572 (6th Cir. 2000) (citation omitted).

In a circumstantial evidence case, such as this one, this circuit has long adopted the

*McDonnell Douglas* rule that a plaintiff may establish a *prima facie* case of discrimination by

showing:

> (1) he is a member of a protected class;
> (2) he was qualified for his job and performed it satisfactorily;
> (3) despite his qualifications and performance, he suffered an adverse employment
> action; and
> (4) he was replaced by a person outside the protected class *or* was treated less
> favorably than a similarly situated individual outside his class.

*Johnson v. Univ. of Cincinnati*, 215 F.3d at 572-73 (citations omitted). *See McDonnell Douglas*

*Corp. v. Green*, 411 U.S. 792, 802-03 (1973). If the plaintiff satisfies the *prima facie* test, the

burden shifts in the second step to the defendant to "articulate some legitimate, nondiscriminatory

reason for the employee's rejection." *Johnson v. Univ. of Cincinnati*, 215 F.3d at 573. Should the

defendant carry this burden, the plaintiff in the third step of the *McDonnell Douglas* framework must

Aquino v. Honda of America Mfg.

introduce sufficient evidence to create a genuine issue of material fact that the proffered reason was merely a pretext to hide unlawful discriminatory motives by showing that (1) the stated reasons had no basis in fact, (2) the stated reasons were not the actual reasons, or (3) the stated reasons were insufficient to explain the defendant's actions. *Ibid.*

In *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003), the Supreme Court reassessed Title VII burdens in light of Section 107 of the Civil Rights Act of 1991, 42 U.S.C. § 2000e-2(m), making available to plaintiffs in circumstantial evidence discrimination cases the possibility of a jury instruction on so-called "mixed motives." *Id.* at 101-02. Under the "mixed motive" standard, plaintiffs may succeed in defeating the defendant's articulation of a legitimate nondiscriminatory motive by demonstrating that the alleged illegitimate motive was, according to the statute, "a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m). That is to say, the plaintiff need not prove that the defendant's stated reason is pretextual if he can demonstrate that at least one illegitimate motive also lay among the defendant's motivations.

This circuit has not yet addressed the question whether the *McDonnell Douglas* framework should be modified in light of *Desert Palace* in the context of suits brought under § 1981. The court below, persuaded by the summary judgment analysis of *Carey v. Fedex Ground Package System, Inc.*, 321 F. Supp. 2d 902 (S.D. Ohio 2004), held that *Desert Palace* had modified the *McDonnell Douglas* framework by altering the plaintiff's burden in the third step so that the plaintiff

> must prove by the preponderance of the evidence either (1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only *one* of the reasons for its conduct,

-13-

No. 04-4274

Aquino v. Honda of America Mfg.

> and another 'motivating factor' is the plaintiff's protected characteristic (mixed-motive alternative).

*Carey v. Fedex*, 321 F. Supp. 2d at 916 (quoting *Dunbar v. Pepsi-Cola Gen. Bottlers of Iowa, Inc.*, 285 F. Supp. 2d 1180, 1197-98 (N.D. Iowa 2003)). Should plaintiffs prevail at this third stage, the *Carey* and *Dubar* courts held that defendants could limit the remedies available to injunctive relief, attorney's fees, and costs by employing the affirmative defense available under 42 U.S.C. § 2000e-5(g)(2)(B); to take advantage of this defense, the defendant must prove in a new fourth step that "it would have taken the same action in the absence of the impermissible motivating factor." *Carey v. Fedex*, 215 F. Supp. 2d at 916 (citations omitted).

Based on this analysis, the *Carey* court denied the defendant's summary judgment motion on the § 1981 claim. However, at least two other district courts in this circuit have subsequently declined to modify the *McDonnell Douglas* framework in summary judgment analysis for Title VII suits in light of *Desert Palace*. In a decision issued on April 18, 2005, seven months after his opinion in our case, the same district judge as in the instant case rejected the *Carey* court's application of *Desert Palace* to a Title VII suit, noting "there seems to be a split even in this Court" and "[t]he Court is hesitant to apply the mixed-motive approach since neither the Sixth nor any other Circuit Courts have spoken on the issue." *Williams v. United Dairy, Inc.*, No. 2:03-CV-868, 2005 U.S. Dist. LEXIS 9349 at * 28 n.7 (S.D. Ohio April 18, 2005) (citations omitted) (granting summary judgment in Title VII suit). *See also Gover v. Speedway Super Am, LLC*, 284 F. Supp. 2d 858, 865 n.1 (S.D. Ohio 2003) (granting summary judgment in Title VII suit because plaintiff had failed to allege mixed motives) . No other courts in this circuit appear to have addressed the question.

-14-

No. 04-4274

Aquino v. Honda of America Mfg.

Applying *Desert Palace* to the *McDonnell Douglas* framework in a § 1981 employment

discrimination suit is inappropriate. Although we have repeatedly stated that § 1981 and Title VII

share the same *prima facie* test, we do not do so blindly. The Supreme Court held in *Desert Palace*

that Congress specifically altered the burdens in a Title VII suit when it passed the 1991 Civil Rights

Act. 539 U.S. at 102. But Congress inserted the specific statutory provision analyzed in *Desert*

*Palace* only into Title VII, 42 U.S.C. 2000e-2(m); it did not amend § 1981 in an analogous fashion.

To the contrary, Congress amended § 1981 in the same 1991 Act only by adding subsections (b) and

(c) for, among other reasons, the purpose of reversing the Supreme Court's holding in *Patterson v.*

*McLean Credit Union*, 491 U.S. 164.[4] *See Jones v. R.R. Donnelley & Sons, Inc.*, 541 U.S. at 372-73.

The *McDonnell Douglas* framework represents federal common law that arose through

interstitial interpretation enforcing Congressional will in the area of employment discrimination, and

it is therefore not inherently limited to Title VII. *Desert Palace*, on the other hand, was an

application of a specific statutory provision added to Title VII in 1991. The provision in question,

Section 107 of the Civil Rights Act of 1991, does not by its plain terms apply to laws other than Title

VII. Nor are § 1981 and Title VII identical in nature; rather, the two laws are distinct and

independent.[5] We hold that *Desert Palace* does not modify *McDonnell Douglas* in employment

---

[4]42 U.S.C. § 1981(b) states "[f]or the purposes of this section, the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." Subsection (c) expands the statute's scope to include non-government discrimination and discrimination under color of state law.

[5]For instance, Title VII applies only to those who employ more than 14 people, 42 U.S.C. § 2000e(b), whereas § 1981 has no minimum threshold. Title VII contains a mandatory

-15-

discrimination lawsuits filed under § 1981.  We therefore reverse the district court's determination, leaving *McDonnell Douglas* intact as the principal framework for assessing circumstantial employment discrimination suits under § 1981.

As noted previously, *McDonnell Douglas* established a tripartite framework for demonstrating employment discrimination.  First, the plaintiff must construct a *prima facie* case by introducing evidence sufficient to prove (1) that he is a member of a protected class, (2) that he suffered an adverse action, (3) that he was qualified for the position, and (4) that he was treated differently than similarly situated members of the unprotected class *or* that the position at issue was filled by a member of the unprotected class.  *McDonnell Douglas*, 411 U.S. at 802; *Alexander v. Local 496, Laborers' Int'l Union*, 177 F.3d 394, 402-03 (6th Cir. 1999).  Aquino asserts, apparently without contradiction, that (1) he is a minority, being of Filipino and Chinese ancestry, (2) Honda terminated his employment, and (3) he was technically qualified for his position.  The evidence supports a reasonable inference that Aquino has established the first three elements of the *McDonnell Douglas* framework's *prima facie* test for summary judgment purposes.

Whether Aquino has established a *prima facie* case of unlawful employment discrimination thus rests on the fourth element of the test.  Aquino asserts that the parties stipulated to the fact that he was replaced by a person outside his protected class, but the evidence to which he points merely

administrative framework for resolving disputes through the Equal Opportunity Employment Commission, 42 U.S.C. § 2000e-5, whereas § 1981 contains no such provision.  More obviously, Title VII relates only to employment discrimination whereas § 1981 has a much broader scope. Congress could have added a "mixed motive" option for lawsuits under § 1981 but lawmakers evidently chose not to do so.

shows the temporary work schedule during the time when Aquino was suspended, not fired. That evidence does not tell us whether he was permanently replaced by a person outside his protected class. In his brief to the court below as well as the one that he filed on appeal, Aquino also pointed out a December 17, 2003 affidavit by a former co-worker at Honda. In the affidavit, this co-worker stated "[a]fter Mike [Aquino] was suspended, then fired, no employee of Asian extraction worked permanent [sic] in N4." The district court did not address this evidence. Taking this evidence in the best possible light, it may be said to state that Aquino was replaced by someone outside his particular protected class, establishing thereby a *prima facie* case under the *McDonnell Douglas* framework. The evidence is clearly not dispositive, for it has not yet been ascertained whether any Asian or non-white employees worked in the assembly line and who, if anyone, actually replaced Aquino. However, for the purposes of summary judgment, the plaintiff simply has an obligation to provide more than a "mere scintilla" of evidence to support its allegations. *Anderson*, 477 U.S. at 252. We therefore find that Aquino has established a *prima facie* case under *McDonnell Douglas*.

In the second stage of the *McDonnell Douglas* framework, the burden shifts to the defendants to assert a legitimate non-discriminatory reason for the dismissal. The defendants' decision to terminate the plaintiff's employment must have been a "*reasonably informed and considered decision*." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 576 (6th Cir. 2003) (en banc) (emphasis in original) (citation omitted). Here, the Honda defendants assert that they terminated Aquino's employment based on their belief that he vandalized several vehicles. The defendants further averred that they were concerned for the safety of Honda's customers. These are clearly valid concerns, pursuant to which the Honda's managers undertook what appears to have been a

reasonable investigation into the matter, and came to believe thereby that Aquino was culpable. Regardless of whether Aquino committed the vandalism, Honda reasonably believed that he had done so and they acted accordingly. Furthermore, Honda discovered knives and its property on his person, further substantiating the company's suspicions. Honda has met its burden to offer a legitimate, non-discriminatory reason for Aquino's dismissal.

*McDonnell Douglas*'s third step requires the plaintiff to introduce evidence to create a genuine issue of material fact that (1) the defendant's stated reasons had no basis in fact, (2) the stated reasons were not the actual reasons, or (3) the stated reasons were insufficient to explain the defendant's actions. *Johnson v. Univ. of Cincinnati*, 215 F.3d at 573. Once this third step is reached, the presumption of discriminatory intent "drops out of the picture." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (citations omitted).

Aquino attempts to meet his burden by trying to discredit Honda's stated reason through innuendo and flat denial. Aquino asserts (but does not introduce evidence to corroborate the assertion) that Honda manipulated the evidence of the incidents and that Roth planted the caps in Aquino's lunchbox. Aquino tries to cast doubt on the veracity of Honda's discovery of these caps by asserting that Honda failed to produce evidence that the caps were found to be missing, that Roth was the sole source of evidence that the caps were discovered in Aquino's lunchbox, and that Roth's statement that he saw the identification badge in the lunchbox is belied by Aquino's claim that the badge was inside a book in the lunchbox. Appellant thereby failed to introduce any evidence to challenge Honda's stated non-discriminatory reason for Aquino's termination. Moreover, Aquino cannot meet his burden of production by simply insisting that Honda had failed to provide evidence

Aquino v. Honda of America Mfg.

to support its reason; Aquino must introduce some evidence to substantiate his claim that Honda's stated reason for terminating his employment was pretextual.

Aquino also challenges the factual conclusions reached by Honda's investigators, constructing a defense that may have proven useful had Honda decided to prosecute Aquino for vandalism and theft. Aquino's defense against the charge that he vandalized the cars on Honda's assembly line might be well-taken, and he has pointed to evidence that might exonerate him were he charged with vandalizing Honda's cars. However, Aquino has not been prosecuted for vandalism. Such evidence does not substantiate his claim that Honda conspired to terminate him out of unlawful motivations, nor does the evidence prove that Honda's stated reason for terminating Aquino's employment was baseless, false, or insufficient to explain Honda's actions.

Aquino may or may not have been the author of the vandalism, but that is essentially beside the point; what the court must assess here is whether Aquino has introduced evidence that Honda's accusation (and therefore its stated reason) was baseless, malicious, or pretextual. Aquino has not accomplished this and we therefore affirm the district court's grant of summary judgment in favor of the Honda defendants.

**IV**

Accordingly, we **AFFIRM** the district court's grant of summary judgment in favor of all defendants.