NOT RECOMMENDED FOR PUBLICATION
File Name: 06a0816n.06
Filed: November 7, 2006

No. 05-4295

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

BASEBALL AT TROTWOOD, LLC, ET AL.,

    Plaintiffs-Appellants,

v.

DAYTON PROFESSIONAL BASEBALL
CLUB, LLC, ET AL.,

    Defendants,

THE CINCINNATI REDS, ET AL.,

    Defendants-Appellees.

_____/

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

BEFORE:    SILER and CLAY, Circuit Judges; and STAFFORD,[*] District Judge.

    **STAFFORD, District Judge.**  Plaintiffs, Baseball at Trotwood, LLC ("BAT"), Rock Newman, Inc. ("RNI"), and Sports Spectrum, Inc. ("SSI") (collectively, "Plaintiffs"), appeal the district court's entry of summary judgment for The Cincinnati Reds, LLC ("Reds") and the City of Dayton, Ohio, ("Dayton" or "City") (collectively, "Defendants") in this action arising from Plaintiffs' unsuccessful effort to locate a Class A minor league baseball franchise in Dayton, Ohio.  We **AFFIRM**.

_____

[*]The Honorable William H. Stafford, Jr., United States District Judge for the Northern District of Florida, sitting by designation.

# I.  BACKGROUND

## A.  Factual

By the mid-1990s, Dayton had become one of the most sought-after markets in the country for minor league baseball teams seeking to relocate.  Under the rules and agreements of Major League Baseball ("MLB") and the entity that governs minor league baseball, the National Association of Baseball Leagues, Inc. ("NAPBLI"), a would-be owner of a minor league team must obtain a territorial waiver from the "local" major league team before locating a minor league team in a new locale.  The territorial rights to the Dayton market are owned by the Reds.  At all times relevant to this lawsuit, John L. Allen ("Allen") was the person designated by MLB to make the decision about whether the Reds would grant a territorial waiver.

Starting in 1996, two separate groups approached Allen and expressed an interest in purchasing and moving a minor league baseball team to Dayton: a group from SSI, including principals Matt Perry ("Perry") and Richard Ehrenreich ("Ehrenreich"), and a group led by husband and wife Tom Dickson ("Dickson") and Sherrie Myers ("Myers").  Each group wanted the Reds to grant it a territorial waiver.  Throughout discussions, Allen made clear that the Reds would only grant a waiver to a group *if* the group (1) reflected the Reds' commitment to achieving minority participation in team ownership; (2) had an achievable and realistic plan to finance a new stadium; and (3) had a team to put in the stadium.  The team, moreover, had to become a minor league affiliate of the Reds.

In addition to obtaining a territorial waiver from the Reds, a would-be owner of a Dayton-based minor league team had to survive a rigorous approval process by MLB, by NAPBLI, and by

the Midwest League of Professional Baseball Clubs, Inc. ("Midwest League" or "League"), a Class A minor league that operates in the geographical area encompassing Dayton and several abutting and non-abutting states to the west and northwest.  Specifically, to *purchase* a team within the Midwest League, a would-be owner must file a Control Interest Transfer Application ("CIT") with the League. The CIT must identify all prospective investors in the team to be purchased and must provide evidence of the owner's plans to finance and operate a team.  If approved by the League after intensive review, the CIT is forwarded to NAPBLI for its consideration, which in turn forwards it to MLB for its evaluation and recommendation.  The ultimate decision rests with NAPBLI, but NAPBLI cannot act until it has received MLB's recommendation.

A related process exists on the seller's end of a transaction that results in the relocation of a team to another city.  In essence, the seller of an existing team must submit an Application for Relocation ("AFR") to the Midwest League.  That application must be approved first by the Midwest League, then by NAPBLI and by MLB.

In 1996, having learned that Dayton and the Downtown Dayton Partnership ("DDP")[1] had formed a task force to explore options for bringing a minor league team to downtown Dayton, Dickson, then owner of a Midwest League minor league franchise located in Lansing, Michigan, contacted City officials and the DDP.  Dickson was not at the time seeking to move his Lansing team, the Lansing Lugnuts ("Lugnuts"), to Dayton.  Instead, he and his wife sought to operate, either individually or in concert, both a Dayton team *and* the Lugnuts, provided they could do so without violating the League's rule prohibiting anyone with an ownership, management, or employment

---

[1] The DDP, a non-profit organization, was formed in 1992 for the purpose of encouraging economic development in Dayton. It is comprised of prominent Dayton business and community leaders and is neither a branch of, nor an agent of, the City of Dayton.

interest in one team from having an ownership or proprietary interest in any other team in the same league.

In early January 1997, SSI executed an option to purchase the Michigan Battle Cats ("Battle Cats"), an existing team in the Midwest League.  On January 13, 1997, SSI talked with Allen, informing Allen about its option to purchase the Battle Cats, and again discussing the waiver.  According to SSI, Allen told Perry and Ehrenreich that if the Reds waived its protected territory, which it was not obligated to do, the waiver would benefit SSI exclusively.  SSI also approached the DDP at or about the same time, discussing options for locating a minor league team in downtown Dayton.  Given Allen's purported promise to SSI, SSI was not concerned that it might be competing with other groups for the privilege of locating a team in Dayton.

On March 7, 1997, relying on Allen's purported promise, SSI executed a Memorandum of Understanding ("MOU") with Hara Complex, Inc. ("Hara") for a stadium project in Trotwood, a suburb on the north side of Dayton.  On March 21, 1997, SSI bought the Battle Cats for $3,300,000, executing an asset purchase agreement to that effect and paying a non-refundable earnest money deposit of $495,000.

In the meantime, the DDP selected Dickson and Myers as the City's partner in bringing baseball to downtown Dayton.  On March 28, 1997, the DDP formalized that selection by signing a binding MOU with Dickson and Myers to that effect.  On April 10, 1997, Dickson wrote to Allen, confirming that DDP had selected Dickson and Myers over SSI in the bid for locating a minor league baseball team in downtown Dayton.  At Allen's direction, DDP, Dickson, and Myers thereafter met with Marge Schott, then owner of the Reds,  regarding a waiver.  Notably, the DDP's selection of Dickson and Myers did not affect SSI's continuing efforts to locate a team in Trotwood.

On April 15, 1997, SSI and Rock Newman ("Newman"), an African-American and sole shareholder of RNI, agreed that Newman would purchase a controlling interest in the Battle Cats, the team that SSI was still attempting to bring to Trotwood, provided SSI's effort to relocate the team succeeded. A few days later, an SSI representative wrote to Allen, advising Allen that SSI had sold a majority interest of its team to an African-American. The name of the African-American was not disclosed to Allen until some months later.

By letter dated May 30, 1997, after months of discussions with various parties, Allen advised the DDP that the Reds would "consider waiving its territorial rights for a major league affiliated minor league baseball team to play in Downtown Dayton provided certain conditions are met." J.A. at 708. Specifically, Allen wrote:

> In order to waive the Reds territorial rights to permit a downtown minor league baseball team, at least the following conditions need to be met by August 15, 1997 and until then the Cincinnati Reds will work exclusively with the Downtown Dayton Partnership:
>
> • An agreement to purchase an acceptable Midwest League Team (A level) and relocate it to Dayton by April 1999 . . . .
>
> • Funding commitments in place by August 15, 1997, which would enable the Dayton community to proceed to build a minor league stadium which meets or exceeds all baseball requirements and which would be ready for play by April, 1999.
>
> • A commitment to work together to market the proposed minor league team in conjunction with the Cincinnati Reds.
>
> • The ownership group of the proposed team would require Reds and all appropriate baseball authorities approval. Our organization, and all of professional baseball supports diversity in ownership, employment and other matters. We require that equal opportunity be exercised in the selection process.

J.A. at 708-09.

After learning about Allen's letter to the DDP, granting the DDP a conditional territorial waiver, Newman met with the DDP. Members of the DDP suggested to Newman that he contact Dickson if he wished to pursue an ownership interest in any team to be established in Dayton. After meeting unsuccessfully with Dickson, Newman wrote to Allen, stating:

> They [members of the DDP] all suggested that I meet with Lansing Lugnuts' owner Tom Dickson, so that we might be able to accomplish the letter and spirit contained in your correspondence to them. All parties seemed genuinely interested and supportive of the Cincinnati Reds' noble desire to broaden the ethnic base of ownership in Minor League Baseball by encouraging African American and other minority ownership in Dayton.
>
> I flew from Dayton to Chicago and met with Mr. Dickson for several hours. In that meeting it became crystal clear to me that Mr. Dickson had no intention whatsoever of allowing me or anyone else to become majority owner in Dayton if he could help it.
>
> My naïve thoughts going into that meeting were that we could collectively accomplish everything for everybody involved while honoring all of the Cincinnati Reds' conditions for approval. Mr. Dickson slammed the door. Informing me that the financial windfall for himself that he anticipated would be compromised if I became majority owner[,] [Mr. Dickson] . . . stated he could satisfy his dual ownership and minority participation problems by inserting his wife as a majority owner.

J.A. at 714-15.

By affidavit, Allen explained his reasons for granting a conditional waiver to the DDP-selected group, Dickson and Myers. First, according to Allen, Dickson and Myers had an excellent reputation and a proven track record as operators of a very successful Midwest team, the Lansing Lugnuts, which was in a market similar to Dayton. Second, Dickson and Myers had the overwhelming support of the Dayton financial, business, and governmental communities, the most

obvious evidence of which was the decision by the DDP (comprised of Dayton's business and government leaders) to partner with Dickson and Myers. Third, based on his review of the numerous proposals and communications received from the competing groups, as well as his conversations with Dayton's financial, government, and business leaders, Allen felt that the DDP-led group would offer more long-term ownership stability and would more likely be able to achieve a realistic stadium financing plan. In comparison, Allen knew that SSI (1) had a reputation for moving in and out of franchises rather than owning a franchise in one location for the long-term, (2) did not have the same level of community support held by the DDP/Dickson/Myers group, and (3) had provided no details of any financing plan. In July 1997, Myers formed the Dayton Professional Baseball Club, LLC ("DPBC") for the purpose of acquiring and operating a minor league baseball team in Dayton. The DPBC thereafter contracted to purchase the Rockford Cubbies, a Midwest League team, from the Chicago Tribune. Because of Myers's agreement with the DDP to bring baseball to Dayton, the DPBA was the *de facto* recipient of the Reds' protected territory waiver.

Also in July 1997, the Dayton City Commission voted four to one in favor of the DDB's recommendation of Dickson and Myers as the City's partner in bringing a minor league team to Dayton. The City thereafter entered into a MOU with the DPBC, the intent of which was to lay the framework through which a lease agreement between Dayton and the DPBC could be negotiated. J.A. at 1183. The MOU/DPBC provided that Dayton would own the stadium facility and site, while the DPBC would lease the facilities. The MOU/DPBC further provided that Dayton would arrange for funding of the project in an amount not to exceed $18.5 million; the DPBC would provide a capital contribution of $1.5 million and prepaid rent in the amount of $4 million; and any cost overruns would be borne by Dayton. The MOU/DPBC also required the DPBC to secure all

necessary approvals from the Midwest League, NAPBLI, and MLB.

After receiving the conditional waiver letter from the Reds, the DDP-led group had difficulties acquiring the necessary approvals from the baseball authorities, largely because of the dual ownership issue. Thus, although the group had received extensions of the August 15 waiver deadline, the DDP and the DPBC could not meet the Reds' waiver conditions in a timely manner. The Reds accordingly notified the DDP in writing that it was terminating–as of September 26, 1997–any commitment the Reds had made to the DDP in its May 30, 1997 letter. Although Myers thereafter continued to pursue efforts to obtain the necessary approvals, she ultimately held a press conference on November 11, 1997, announcing that she was terminating her efforts to bring baseball to downtown Dayton.

The City soon after sent Myers a Termination Agreement, the purpose of which was to terminate the City's MOU with the DPBC. Myers never signed the Termination Agreement; indeed, she declined the City's request for a mutual termination. The City, moreover, determined that it was not in its best interests to unilaterally terminate the MOU/DPBC. While Myers indicated that she would not personally bring a team to Dayton, her rights in the MOU/DPBC could be assigned to somebody else who potentially could fulfill the obligations. The City thus determined that it would explore such an option, an option that would permit the City "to have baseball played in downtown in a stadium designed to its liking on a brown field site within the time lines desired by us all." J.A. at 1157.

When Myers and the DDP failed to obtain the necessary approvals within the extended waiver period, the Reds issued SSI a conditional territorial waiver until January 26, 1998. Among other things, the waiver was conditioned on SSI's including a number of Dayton residents in its

ownership group, on SSI's giving the Reds a small equity investment in the Club, and on SSI's allowing the Reds to have input into the selection of any full time executive that SSI might appoint to manage the club.

Having received the Reds' conditional territorial waiver, SSI again had discussions with the DDP about bringing a team to downtown Dayton. By this time, the City had learned that newly-disclosed environmental concerns with the site and expected financial shortfalls in the sources of funding had significantly changed the budgetary and financial circumstances with regard to the stadium. Accordingly, the City had decided to increase the budget cap on the project to $22.7 million, to decrease the stadium cap to $14.5 million, and to try to find third-party funding to cover the $2.7 million shortfall. Because of the changed circumstances, the City determined that it would need a larger capital contribution from SSI than had been proposed earlier for Myers and the DPBC. Because of the City's increased financial demands, SSI ultimately decided to abandon its negotiations with the City and the DDP.

Unable to reach an agreement with the City and the DDP, SSI returned to the City of Trotwood and Hara, entering into a new arrangement with those entities to bring a minor league team to Trotwood. In furtherance of that end, SSI and RNI formed BAT (Baseball at Trotwood, LLC) to serve as the business entity responsible for bringing the Battle Cats to Trotwood. BAT thereafter filed CIT and AFR applications with the Midwest League and with NAPBLI. Neither application was approved before the protected territory waiver granted to SSI expired on January 26, 1998.

In early January 1998, Myers began actively pursuing a buyer for the DPBC. In February 1998, Mandalay Sports Entertainment ("Mandalay") bought the DPBC from Myers. At the same time, Mandalay bought the assets of the Rockford Cubbies. Although the MOU/DPBC was still in

effect, Mandalay assured the City that it was willing to adjust the financial aspects of the arrangement. After completing extensive due diligence on the background, financial capabilities, and experience of Mandalay, the City consented to the assignment of Myers's MOU/DPBC rights to DPBC/Mandalay. Indeed, the agreement eventually negotiated with the DPBC under Mandalay's management provided that Mandalay would cover stadium cost overruns exceeding $22.7; that Mandalay would own, operate, and maintain the stadium; that Mandalay would be responsible for all operations and capital maintenance costs as well as any subsequent upgrades to the stadium; and that Mandalay would make an equity investment of $4 million. According to the City's Economic Development Director, Joseph Tuss, these terms guaranteed that the City would have no unexpected future costs.

## B. Procedural

In 1998, Plaintiffs filed a nine-count complaint against twenty-seven defendants, including the City of Dayton and the Reds. Among other things, Plaintiffs sued the Reds for: (1) tortious interference with existing and prospective contractual and business relations (Count III); (2) civil conspiracy (Count V); (3) promissory estoppel (Count VII); (4) contract discrimination in violation of 42 U.S.C. § 1981 (Count VIII); and conspiracy to discriminate in violation of 42 U.S.C. § 1985 (Count IX). Plaintiffs sued the City of Dayton for: (1) tortious interference with existing and prospective contractual and business relations (Count III); (2) detrimental reliance (Count IV); (3) civil conspiracy (Count V); (4) contract discrimination in violation of 42 U.S.C. § 1981 (Count VIII); and conspiracy to discriminate in violation of 42 U.S.C. § 1985 (Count IX).

The City and the Reds moved for summary judgment as to all claims. The district court granted the City's motion for summary judgment in its entirety, explaining its decision in a 180-page

opinion entered September 23, 2003. In that same opinion, the district court granted the Red's motion for summary judgment as to the civil conspiracy, estoppel and § 1985 claims; granted the motion in part and denied it in part as to the tortious interference claim; and denied the motion as to the § 1981 claim.

At the district court's invitation, the Reds later filed a supplemental motion for summary judgment, supported by two affidavits from John Allen. After Plaintiffs unsuccessfully moved to strike the two Allen affidavits, the district court granted the Reds' supplemental motion. On September 6, 2005, the district court entered judgment in favor of all defendants and against Plaintiffs on all claims set forth in Plaintiffs' amended complaint. This appeal was filed on October 6, 2005.

## II. DISCUSSION

### A. Motion to Strike

This court reviews a district court's decision on a motion to strike an affidavit for abuse of discretion. *Seay v. Tenn. Valley Auth.*, 339 F.3d 454, 480 (6th Cir. 2003). "'[D]ecisions that are reasonable, that is, not arbitrary, will not be overturned.'" *Id.* (quoting *Collazos-Cruz v. United States*, 117 F.3d 1420 (Table), 1997 WL 377037, at *2 (6th Cir. July 3, 1997) (*per curiam*)).

In his affidavits, filed in support of the Reds' supplemental motion for summary judgment, Allen explained why he chose to send–on May 30, 1997–a conditional territorial waiver to DDP-backed Myers/Dickson instead of SSI. In essence, Allen stated that he believed that the DDP-backed group (1) was the choice of the Dayton community, (2) would provide more long-term stability, and (3) had a more realistic and achievable stadium financing plan. In contrast, Allen stated that he was not confident that SSI could finance a new stadium, provide the stability that the Reds desired, or

garner community support.

Plaintiffs moved to strike Allen's affidavits, arguing that many of Allen's statements were not based on Allen's personal knowledge, did not set forth specific facts that would be admissible in evidence, were contradictory to Allen's deposition testimony, and/or were not statements to which Allen was competent to testify.  The district court rejected these arguments and denied the motions to strike.  Concluding that Allen's affidavits constituted, in large measure, Allen's explanation about why he issued the waiver to the DDP, the district court wrote:

> Since the question [regarding Plaintiffs' section 1981 claim] is whether the Reds have articulated a non-discriminatory reason for choosing the DDP over the SSI group, which was affiliated with a prominent African-American, the Court must consider Allen's explanations concerning his beliefs or perceptions about the circumstances surrounding that decision, rather than the truth of the matters set forth in that affidavit.  It bears emphasis that out of court statements which are not offered for the truth of the matter asserted therein do not constitute hearsay.

J.A. at 875.  We agree with the district court's rationale, and we find no abuse of discretion in the court's decision to deny Plaintiffs' motion to strike.

**B.  Summary Judgment for the Reds**

Plaintiffs contend that the district court erred by entering summary judgment for the Reds on Plaintiffs' § 1981, civil conspiracy and § 1985 conspiracy, promissory estoppel, and tortious interference claims.  This court reviews *de novo* a district court's grant of summary judgment. *Peltier v. United States*, 388 F.3d 984, 987 (6th Cir. 2004).

**1.  Section 1981 Claim**

Claims of race discrimination under 42 U.S.C. § 1981 are analyzed using the familiar burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

*Patterson v. McLean Credit Union*, 491 U.S. 164, 186 (1989). Under *McDonnell Douglas*, if a plaintiff sustains his or her burden of establishing a *prima facie* case of race discrimination, the burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for its actions. If the defendant sustains this "extremely light" burden of production, *Frazier v. Ford Motor Co.*, 109 Fed. Appx. 718, 721 (6th Cir. 2004) (unpublished decision), the burden returns to the plaintiff to prove by a preponderance of the evidence that "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981); *see also Aquino v. Honda of Am., Inc.*, 158 Fed. Appx. 667, 675-76 (6th Cir. 2005) (unpublished decision) (holding that the Supreme Court's recent decision in *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003), did not modify the *McDonnell Douglas* framework for assessing circumstantial employment discrimination suits under § 1981). To prove pretext, the plaintiff "must produce sufficient evidence from which the jury could 'reasonably reject [the defendants'] explanation' and infer that the defendants 'intentionally discriminated' against her." *Balmer v. HCA, Inc.*, 423 F.3d 606, 614 (6th Cir. 2005) (quoting *Woythal v. Tex-Tenn Corp.*, 112 F.3d 243, 246-47 (6th Cir. 1997)). As explained by the court in *Balmer*:

> The plaintiff must submit evidence demonstrating that the employer did not "'honestly believe' in the proffered non-discriminatory reason for its adverse employment action." *Braithwaite v. Timken Co.*, 258 F.3d 488, 494 (6th Cir. 2001) (citing *Smith v. Chrysler*, 155 F.3d 799, 806-07 (6th Cir. 1998)). To inquire into the defendant's "honest belief," the court looks to whether the employer can establish "reasonable reliance" on the particularized facts that were before the employer when the decision was made. *Smith*, 155 F.3d at 807 ("[T]he key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action."). . . . If there is no reasonable dispute that the employer made a "reasonably informed and considered decision" that demonstrates an "honest belief" in the proffered reason for the adverse employment action, the case should be dismissed since no

> reasonable juror could find that the employer's adverse employment action was pretextual. *See Braithwaite*, 258 F.3d at 494.

*Balmer*, 423 F.3d at 614.

Here, through the affidavits of Allen, the Reds explained that a conditional waiver was granted to the DDP-backed Dickson/Myers group because, in Allen's mind, (1) the DDP-backed group was the choice of the Dayton community; (2) the DDP-backed group would provide more long-term stability; and (3) the DDP-backed group had a more realistic and achievable stadium financing plan. Plaintiffs do not appear to challenge the district court's conclusion that the Reds met their burden of production by articulating non-discriminatory reasons for its waiver decision.

Instead, Plaintiffs appear to challenge the district court's conclusion that Plaintiffs failed to demonstrate pretext. The record, however, more than adequately supports that district court's decision in this regard. The evidence demonstrates, for example, that the DDP is comprised of Dayton's business and civic leaders, including the City's mayor; that the DDP's Baseball Task Force led the effort to bring a minor league team to downtown Dayton; that the DDP selected the Dickson/Myers group over Plaintiffs as its partner in bringing baseball to downtown Dayton; that the DDP selected the Dickson/Myers group following an extensive review of several groups, including Plaintiffs; and that community leaders expressed their enthusiasm to Allen about the DDP's plan to bring baseball to Dayton through a partnership with Dickson and Myers. Plaintiffs produced little if anything to challenge Allen's quite understandable desire to work with an ownership group that had the support of the DDP and its membership of business and community leaders.

In addition, Plaintiffs offered no evidence to refute Allen's belief that ownership stability could become an issue with SSI, based on SSI's history of buying and selling minor league

franchises. To be sure, Plaintiffs may be correct in saying that, based on its history, SSI had more baseball experience than either Dickson or Myers. Nonetheless, it is undisputed that Allen was less interested in the relative inexperience of Dickson and Myers and more interested in the fact that–unlike SSI's Perry–Dickson and Myers were not team brokers.[2] The record is clear that the Reds wanted franchise stability, and Plaintiffs presented nothing to undermine the legitimacy of Allen's belief that the DDP-backed group was a safer bet for achieving that stability.

Plaintiffs, moreover, failed to refute Allen's belief that the stadium financing plan proposed by Dickson and Myers, a plan that then included both actual and near commitments of significant public funds, was more realistic and achievable than SSI's largely vague and speculative financing plan. Taking issue with Allen's belief in this regard, Plaintiffs point to the Executive Summary that they submitted to the Reds, a plan–they say–that "set out in detail the funding sources, local municipalities and possibly private funding and [sic] the State of Ohio, for the construction of a $20 million stadium at Hara." Pl.'s Br. at 34. The Executive Summary, however, provided no information about funding *commitments*. Instead, it described Plaintiffs' financing plan in terms of *possibilities*. For example, it was stated in the Executive Summary that "[i]t is possible that the State of Ohio might contribute capital funds;" J.A. at 749; "[o]ther private funding sources may also become available;" *id.*; "Trotwood, Harrison Township and perhaps other communities in the area . . . will agree to lend their credit to support bonds or certificates of participation . . . in the approximate amount of $20 million;" *id.* at 748; "[i]t is anticipated that bonds will be issued tax-free;" *id.*; and "[d]ebt service guarantees will be issued by the member municipalities in accordance

_____

[2] As he explained during his deposition, Perry "was in the business of buying and selling teams and doing consulting." J.A. at 1309. Over time, Perry assisted in the purchase and/or sale of six teams, including two hockey franchises. *Id.* at 1311.

with the contract [to be] entered into at the time of the formation of the [entity that will take title to the new ballpark]." *Id.* Such *possibilities* do little to undermine the Reds' assertion that Allen had an "honest belief" and made a "reasonably informed and considered decision" that the DDP-backed groups had a more realistic and achievable stadium financing plan.

Finally, of particular relevance to their claim of race discrimination, Plaintiffs failed to controvert the Reds' evidence that diversity in team ownership was significant to the Reds' organization; that the Reds expected every group interested in locating a minor league team in Dayton, including the DDP-backed group, to include African Americans in the team's "ownership, employment and other matters;" that the DDP acknowledged and addressed the Reds' interest in diversity by seeking the financial participation of African Americans;[3] and that African Americans (Archie Griffin and Magic Johnson) are, in fact, part owners of the Reds minor league team that ultimately settled in Dayton. Such evidence greatly undermines Plaintiffs' claim that the Reds discriminated against them on the basis of race.

### 2. Civil Conspiracy and Section 1985 Conspiracy Claims

In their amended complaint, Plaintiffs alleged that the Reds conspired with the DDP and others "to prevent the Plaintiffs from owning and relocating the Michigan Battle Cats to the Dayton Area" by "hamper[ing], impair[ing] and imped[ing] the [AFR] filed by BAT, Rock Newman, Inc.

---

[3] In a letter to Allen dated April 22, 1997, the DDP assured Allen that "African-American ownership of the minor league team by our local African-American leaders can be obtained." J.A. at 724. The DDP also informed Allen that it had "had discussions with representatives of the African-American CEO's organization which has already pledged $50,000 in financial support to our endeavor." *Id.* Similarly, in a letter dated May 16, 1997, the DDP informed Allen that it had "worked to satisfy the conditions we discussed: . . . [including] Identification of local, African American business people who are ready and willing to financially participate in minor league baseball in our downtown, including Mervyn Alphonso, Dayton President, Key Bank, as well as numerous other local African-American CEOs." J.A. at 731.

and the Michigan Battle Cats for the reason that Defendants . . . DDP, Myers, DPBC, Dickson, The Reds [and others] prefer a white citizen-owned Minor League Baseball franchise." Am. Compl. at ¶¶ 140, 164; J.A. at 107, 112. Before the district court, Plaintiffs argued that "the Reds conspired with at least the DDP to issue the conditional waiver contract the Reds had promised to SSI to the DDP instead with the intention of interfering with the Plaintiffs' ability to enter into business relationships by filing Applications with the Midwest League and the NAPBL. . . ." J.A. at 316.

To prove a civil conspiracy under Ohio law, a plaintiff must prove "a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages." *Williams v. Aetna Fin. Co.*, 700 N.E.2d 859, 868 (Ohio 1998) (internal quotation marks and citation omitted). To prove a conspiracy under section 1985, a plaintiff must show that (1) the defendants conspired together for the purpose of depriving, directly or indirectly, a person or class of persons of the equal protection of the laws; (2) the defendants committed an act in furtherance of the conspiracy which caused injury to person or property or a deprivation of any right or privilege of a citizen of the United States; and (3) the conspiracy was motivated by racial, or other class-based, invidiously discriminatory animus. *Bass v. Robinson*, 167 F.3d 1041, 1050 (6th Cir. 1999).

Here, the district court disposed of Plaintiffs' conspiracy claims in the following words:

> [A]s they have done throughout their various opposition briefs, the Plaintiffs confuse business agreements with conspiracies. The two are clearly not the same. The fact that an agreement between two parties has a negative effect on a third party does not transform that agreement into a conspiracy. Anyone is allowed to compete with anyone else, within the bounds of the law, for the benefit of a bargain. There is no evidence that the DDP was aware that the protected territory waiver had been promised to SSI, such that it could enter into an agreement with the Reds to interfere with the execution of that promise. More importantly, there are not facts from which one could

draw a reasonable inference that the Reds and the DDP agreed to maliciously injure SSI.

J.A. at 572-73.

On appeal, based on evidence showing that Allen issued the waiver to DDP *after* he learned that an African-American was the majority owner of Plaintiffs' Battle Cats team, Plaintiffs do little more than suggest that "it is reasonable to infer that Allen never intended to consider any minority ownership in a Dayton team." Pl.'s Br. at 43. While they assert–without citing to record evidence–that Allen and the DDP "knew that if Allen issued the waiver to DDP, which had already selected Dickson/Myers, a non-protected group, that a protected group would be prevented from attaining a much-coveted business deal in Dayton," *id.,* such assertion, even if true, does not provide a basis for a conspiracy claim. Because Plaintiffs offer neither evidentiary support nor "developed argumentation" regarding their conspiracy claims, and because they make no attempt to address the deficiencies in proof found by the district court, we find no basis for disturbing the district court's decision as to Plaintiffs' conspiracy claims. *See United States v. Elder*, 90 F.3d 1110, 1118 (6th Cir. 1996) (explaining that it is a "'settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived'") (quoting *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990).

### 3. Promissory Estoppel Claim

Plaintiffs claim that, in January 1997, Allen promised that, if the Reds agreed to grant a territorial waiver, the waiver would be granted in favor of SSI. In March 1997, allegedly in reliance on Allen's promise, Plaintiffs entered into both an MOU with Hara regarding a stadium project as well as an asset purchase agreement with the then-owners of the Michigan Battle Cats, paying $495,000 as a non-refundable earnest money deposit for the latter. Plaintiffs claim that when Allen

failed to grant them a territorial waiver, Plaintiffs were damaged by the loss of their earnest money deposit. They seek relief based on the doctrine of promissory estoppel.

In Ohio, the elements necessary to establish a claim for promissory estoppel are: (1) a clear and unambiguous promise; (2) reliance upon the promise by the promisee; (3) reliance by the promisee that is both reasonable and foreseeable; and, (4) injury to the promisee as a result of the reliance. *Weiper v. W.A. Hill & Assocs.*, 661 N.E.2d 796, 803 (Oh. Ct. App. 1995).

The district court in this case assumed–for purposes of the Reds' motion for summary judgment–that Allen did promise that, if the Reds granted a territorial waiver, it would be granted to SSI. The district court nonetheless entered summary judgment in the Reds' favor on Plaintiffs' promissory estoppel claim. Among other things, the district court noted that (1) Plaintiffs acquired an option on the Battle Cats *before* Allen made any alleged promises to SSI, albeit their nonrefundable deposit was paid *after* Allen made his alleged promise; (2) Allen made it perfectly clear to Plaintiffs–and Plaintiffs conceded–that the Reds had not decided (both when Allen made his alleged promise to SSI and when SSI entered into contracts with the owners of the Battle Cats and Hara) whether a waiver would be granted to anyone, SSI included; (3) SSI ultimately received a conditional waiver from the Reds; and (4) there was no evidence in the record to suggest that, when the Reds granted a conditional waiver to SSI, SSI's investments–including its earnest money deposit and its agreement with Hara–no longer retained their value. Under the circumstances, the district court found it "illogical" to find that Plaintiffs either reasonably relied on or were harmed by Allen's alleged promise.

On appeal, Plaintiffs baldly state that they relied on Allen's promise, but they utterly fail to explain why this court should fault the district court either for concluding that "it would be illogical

to find SSI's financial outlays were in reliance on Allen's conditional promise to grant it the waiver" or for finding that "[t]he Plaintiffs have submitted no evidence that they suffered injury, pecuniary or otherwise, because of the six months or so lapse of time between the time they expected to receive the waiver and the time they actually received it." J.A. at 571-72. Lacking detail, citation to <u>facts</u> in the record, and cogent argument, Plaintiffs' brief provides no basis for reversing the district court.

### 4. Tortious Interference Claim

Plaintiffs alleged in their amended complaint that the Reds tortiously interfered with Plaintiffs' existing and prospective contractual and business relationships. Specifically, they alleged that, by issuing a protected territory waiver to the DDP in May 1997, the Reds tortiously interfered with Plaintiffs' contract to purchase the Battle Cats and Plaintiffs' MOU with Hara regarding the Hara Arena. In addition, they alleged that the Reds exerted influence on the Midwest League and/or NAPBLI, causing those organizations to refuse to review Plaintiffs' CIT and AFR applications. Finding no record support for either allegation, the district court granted summary judgment to the Reds on Plaintiffs' tortious interference claim. The district court did not err in this regard.

Under Ohio law, tortious interference with a business relationship and/or a contract occurs "when a person, without a privilege to do so, induces or otherwise purposely causes a third person not to enter into or continue a business relation with another, or not to perform a contract with another." *A & B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*, 651 N.E.2d 1283, 1294 (Ohio 1995); *Wright v. MetroHealth Med. Ctr.*, 58 F.3d 1130, 1138 (6th Cir. 1995).

Here, Plaintiffs have provided no evidence that Allen or anyone else with the Reds contacted, much less exerted influence on, either the Midwest League or NAPBLI with regard to their review

of Plaintiffs' CIT and AFR applications.   Based on this record, we can only speculate about why the League and NAPBLI failed to review Plaintiffs' applications.  We can also only speculate about whether the League and NAPBLI would have granted the applications even if Plaintiffs had been granted a waiver by the Reds.  Such speculation does not support a claim of tortious interference.

Furthermore, there is no evidence to suggest that the Battle Cats and/or Hara breached their contracts, or ended their relationships, with Plaintiffs because of anything the Reds did or did not do.  When Plaintiffs entered into their respective business relationships/contracts with Hara and  the Battle Cats, they *gambled* that the Reds would grant them a territorial waiver.  As explained by SSI principal Perry during his deposition:

> [Allen] had indicated to us that it was going to be his decision.  Not that he would waive it or not, but that it's [Allen's] decision and he's considering very favorably  waiving the territory.
>
> . . . .
>
> . . . We knew the Reds' decision could be no, we're not waiving the territory but we felt strong enough that things were looking positive that we went ahead and put money in place [for the Battle Cats and Hara Arena].

J.A. at 1319-20, 1321-22.  Plaintiffs lost their gamble, but their loss was not the result of tortious interference by the Reds.

## C.  Summary Judgment for the City of Dayton

On appeal, Plaintiffs assert that the district court erred in granting summary judgment to the City of Dayton on Plaintiff's § 1981 and § 1985 claims.  Plaintiffs do not appeal the district court's ruling as to their tortious interference, detrimental reliance, and civil conspiracy claims against the City.

### 1.  Section 1981 Claim

In essence, Plaintiffs alleged that the City failed to select Plaintiffs, the BAT entities, as the City's partner in bringing baseball to Dayton based on Rock Newman's race. In moving for summary judgment, the City proffered numerous legitimate reasons–largely financial–for its ultimate decision to select Mandalay rather than Plaintiffs, and the district court found that Plaintiffs failed to demonstrate that the City's articulated reasons for its actions were pretextual. The district court accordingly entered summary judgment in favor of the City on Plaintiffs' § 1981 claim.

As noted by the district court, the City believed that it could not unilaterally terminate the MOU/DPBC without incurring significant liquidated damages. Indeed, the MOU/DPBC provided that, in limited defined circumstances, the "the City ha[d] the right, but not the obligation, to withdraw from the Project upon a majority vote of the City Commission . . . and upon payment by the City to the Tenant of $500,000 as liquidated damages for such withdrawal." J.A. at 1186. Plaintiffs contend that Myers's November 1997 public announcement that she was terminating her efforts to bring baseball to downtown Dayton constituted a *de facto* termination of the MOU/DPBC, freeing the City from its obligation to pay liquidated damages. It is undisputed, however, that, when the City asked Myers to memorialize what appeared to be her termination of the MOU/DPBC, she refused to do so. Moreover, in a letter dated December 6, 1997, weeks after Myers made her public announcement, SSI's Ehrenreich expressed concern about the continuing effect of the MOU/DPBC, explaining to the City Manager that "we cannot present our proposal to the City until you formally terminate the City's agreement with Tom Dickson and Sherrie Myers, which the City Commission authorized weeks ago."[4] J.A. at 1052. As correctly recognized by the district court, the City "had

_____

[4] By letter dated December 1, 1997, the Mayor of Dayton, Michael Turner, offered SSI the City's assistance in "bringing minor league baseball to our downtown." J.A. at 1351. Prior to that time, the City Manager had informed Ehrenreich that he could provide to the City, on "an unsolicited

a genuine concern, from a legal perspective, that it could not terminate the DPBC MOU unilaterally without incurring a $500,000 penalty." J.A. at 606.

Consistent with its concern about the continuing effect of the MOU/DPBC, the City decided to explore the possibility that Myers might sell the Rockford Cubbies and assign the MOU/DPBC to another group interested in bringing baseball to Dayton. BAT was one such group. Indeed, on November 12, 1997, the day following the public announcement by Myers, Ehrenreich called someone–he couldn't recall if it was Myers's attorney or "one of the guys at the Cubs"–to offer to purchase Myers's interest in the Cubbies. The response was: "We're still taking [what happened yesterday] all in and we'll call you if we're interested." J.A. at 1019. Ehrenreich never received a call back and he never pursued the matter further. As he admitted in his deposition: "I was really never interested in purchasing her interest." *Id.* at 1043. Thus, as proffered by the City and noted by the district court, BAT failed to make itself a practicable option for the MOU/DPBC-bound City.

Mandalay, on the other hand, not only agreed to acquire the MOU/DPBC by purchasing the DPBC; it also agreed to negotiate different financial terms with the City: namely, it agreed to increase the stadium budget cap to $22.7 million (to reflect added environmental costs), decrease the City's funding commitment to $14.5 million (to reflect the City's budget problems), and find a third party (perhaps the team) to cover the shortfall. Thus, unlike BAT, Mandalay presented the City with what the City considered to be a viable option, an option that not only resolved the contractual issues with which the City struggled but also addressed the budgetary problems with which the City was newly faced. Although Plaintiffs contend that the agreement reached with Mandalay was a "far worse stadium deal" than the deal informally offered by BAT, BAT never presented the City with

basis," SSI's proposal for bringing baseball to downtown Dayton. *Id.* at 1148.

an option that was similar to the overall-acceptable option presented by Mandalay. As the district court quite properly determined, Plaintiffs failed to demonstrate that the City's contractual and financial reasons for choosing Mandalay were pretextual.

The district court was not persuaded otherwise by Plaintiffs' reference to a purportedly racist comment made by the Mayor of Dayton. According to Ehrenreich, the Mayor at one time asked Ehrenreich whether BAT would consider dealing with Dayton without the involvement of Newman. The Mayor explained by saying: "[W]ell, [Newman] called me a racist and I resent that." J.A. at 1028. The district court determined that this statement constituted neither direct nor indirect evidence of racial animus. Rather, the court wrote: "[I]t gives rise to a finding that Mayor Turner did not like Newman." *Id.* at 610. The district court thus rejected Plaintiffs' argument that the Mayor's resentment of Newman (for calling the Mayor a racist) was sufficient to give rise to an inference that the Mayor himself was emoting racist sentiments. As the district court correctly suggested, it is not unlawful to resent someone for the disparaging remarks he or she makes.

Plaintiffs contend that the district court failed to draw reasonable inferences in Plaintiffs' favor, granted unwarranted deference to the City's business judgment, and ignored Plaintiffs' evidence that, even if the City's proffered reasons had a basis in fact, those reasons were insufficient to motivate the City's decision to award the minor league baseball franchise to Mandalay rather than BAT. We find no merit to Plaintiff's arguments. The district court correctly found that the City was entitled to summary judgment on Plaintiffs' § 1981 claim, Plaintiffs having utterly failed to establish pretext.

### 2. Section 1985 Conspiracy Claim

The district court disposed of Plaintiff's § 1985 conspiracy claim by writing:

The Plaintiffs have not adduced any evidence that the City entered into an agreement to deprive them of their equal protections of the law.  There is also no evidence of racial animus. . . .[T]here being no genuine issue of material fact, the City's Motion for Summary Judgment is SUSTAINED.

J.A. at 611.  We find no error in the district court's treatment of this claim.

### III.  CONCLUSION

For the reasons set forth above, we **AFFIRM** the judgment of the district court.